**HAGERUP v. HARRIS et al.**

**PUZEY v. WILSON.**

Nos. 5715-A, 5719-A.

District Court of Alaska. First Division. Juneau.

May 17, 1948.

M. G. Monagle, of Juneau, Alaska, for Carl F. Hagerup and Sanders A. Wilson.

William L. Paul, Jr., of Juneau, Alaska, for Frank W. Harris and others and Leota Puzey.

FOLTA, District Judge.

These actions are for the recovery of the possession of real property and the determination of adverse claims respectively. Trial by jury was waived in the first case, and by stipulation the second case was dismissed as to the defendants Harris and Puzey. Both cases arise out of the following facts:

On March 23, 1934, Harris mortgaged a tract of tideland to John Reck in trust for certain creditors, which was sold

on August 15, 1938, to Reck, pursuant to foreclosure proceedings and a deed issued to him on September 23, 1939. Judgment was also obtained for a deficiency in the sum of several thousand dollars. In 1944 a part of this tract was sold to defendant Wilson, and in 1947 plaintiff Hagerup acquired another portion. Both claim title through Reck. Plaintiff Puzey in cause No. 5715–A claims title through use and occupancy initiated by her predecessor John Lawson.

Defendant Westfall claims a portion of the tract conveyed to plaintiff Hagerup in No. 5719–A by virtue of use and occupancy initiated in 1936.

In each case the title, derived through Reck as purchaser, is defended on two grounds (1) that, between the date of execution of the mortgage and its sale under foreclosure, the premises were occupied and hence not open to entry, use or occupancy by any other person; and (2) that John Lawson in cause No. 5715–A and Jack Westfall in cause No. 5719–A, who pretended to initiate possessory rights in their tracts, were acting for mortgagor Harris who, when he realized he was going to default in the payment of the indebtedness secured by the mortgage, conceived a scheme to save a part of the mortgaged premises by having Lawson and Westfall enter upon, use, occupy and improve the areas in dispute; and that since Harris could not acquire any interest in the mortgaged premises adverse to the mortgagee before the period of redemption had expired in September, 1939, Lawson and Westfall were likewise precluded from acquiring any interest for Harris adverse to Reck or his grantees.

I am of the opinion that there is ample evidence to sustain the second contention. Indeed, the evidence produced in these cases and the companion case of Lawson v. Wilson, No. 5525–A, is, when viewed as a whole, absolutely irreconcilable except on the theory that Lawson and Westfall acted for Harris in an attempt to defraud the mortgagee and subsequent purchasers. Both were intimate friends of

Harris. Lawson lived with Harris for a time and in one of his houses. Westfall was a former employee and occupied Harris' home from 1936 to 1944 rent free. Harris made no payments on the mortgage after October, 1934. Thereafter, Lawson went into the actual possession of that part of the mortgaged premises now claimed by Puzey, in cause No. 5715–A, as Lawson's grantee, and Westfall went into the actual possession of that part of the mortgaged premises involved in cause No. 5719–A. Harris lived in a house adjoining the mortgaged premises and knew that, if he allowed Lawson and Westfall to continue in the use and occupancy of these tracts, which constituted parts of the premises mortgaged to Reck, the value of his property would to that extent be diminished and, if he defaulted, that the price brought upon a foreclosure sale of the property would be that much less or the deficiency that much greater. Notwithstanding that he stood to lose in any event, he testified that he not only allowed Lawson and Westfall to use and occupy these tracts, but paid the taxes thereon from 1936 to 1939. Not only is it incredible that these intimate friends would deliberately "jump" Harris' land, but the payment of taxes with knowledge of such use and occupancy is utterly inconsistent with the theory that such use or occupancy was hostile to Harris. Lawson erected a boatshed on the tract referred to and remained in possession until Wilson bought the land from mortgagee-purchaser Reck in December, 1944, and Westfall filled with rock the small area claimed by plaintiff Hagerup.

### Cause No. 5715–A, Puzey v. Wilson.

Fields, a witness produced on behalf of Lawson in the case of Lawson v. Wilson already decided, and in behalf of Westfall in the case of Hagerup v. Westfall, and in behalf of Puzey in Puzey v. Wilson, testified that when Lawson and Dan Sooter were, subsequently to the execution of the mortgage by Harris, renewing the piling and decking over the area involved in Lawson v. Wilson and Puzey v. Wilson, Lawson told him that they were doing the work for

Harris and that Harris "was around there giving them orders." At that time Lawson was living in Harris' home.

When Fields, who is also a boat builder, decided to obtain the use of Lawson's boatshed, in 1943 or 1944, Lawson told him that he would sell the boatshed to him for $80; that all he owned was the lumber in the boatshed and that Harris owned the land. In these circumstances Fields chose to rent rather than buy.

Before purchasing the tract on which the boatshed stood from Reck, Wilson inquired of Harris what Lawson's interest was in that particular tract and was told by Harris that "Lawson claimed it." He then asked Harris what, if any, interest he had in the property, to which Harris answered, "Well, I own it, and I don't own it." Not being able to obtain any satisfactory explanation of this equivocal answer, Wilson, after an examination of the title records, decided to ignore the incident and purchased the property. When he attempted to take possession in February, 1945, Harris challenged him. Wilson announced that he had just bought the property and was going to take possession. Harris countered that it was not Wilson's property and he would take possession only over his dead body. Wilson then had Harris arrested on the charge of trespass.

In the trespass case Harris testified that Lawson was the owner, notwithstanding that, on July 16, 1943, Harris had prepared and induced Lawson to execute a deed of this property to plaintiff Puzey, Harris' daughter. Wilson contends that this was Harris' "ace in the hole" to be used only if Lawson did not prevail in the former suit of Lawson v. Wilson, No. 5525-A. This deed was not recorded and, although its existence was disclosed on the trial of Lawson v. Wilson, no satisfactory explanation of this strange transaction was made in that or the instant cases. Lawson failed to produce it or to account for its nonproduction. In the former case, it having appeared by the testimony that Lawson had parted with the possession of the deed under circumstances from which delivery could be

inferred, the Court held that Lawson was not the real party in interest, but the Court did not find it necessary until now to decide whether Lawson was acting as a mere front for Harris. Upon the termination of Lawson v. Wilson, the present suit was brought by plaintiff Puzey as the grantee of Lawson.

After his arrest upon the complaint of Wilson, Harris prepared and mailed to Lawson at Hoonah, for his execution, a power of attorney authorizing Harris to act for Lawson in connection with the premises in dispute. It is significant that several months later, at a conference at which Harris, Lawson and Wilson were present, when Wilson inquired as to what Lawson would sell his interest for in the premises occupied by the boatshed, neither Lawson nor Harris disclosed the fact that Lawson had already conveyed the premises to plaintiff Puzey. For all that appeared, Lawson still claimed ownership, and Harris pretended to act solely under the authority of a power of attorney from one who had already parted with his title. Lawson apparently lost interest in the controversy after this deed came to light and, although he was available, he was not produced as a witness in the instant case. Likewise, Puzey did not appear in the trial of Lawson v. Wilson, or the instant case, although it was not shown that she was unavailable. The consideration recited in the deed is $1, but Harris testified that the actual consideration was $1 and some shafting located at Auk Bay. So far as appears, Puzey knew nothing of the execution of this instrument and never went into possession under it, and it is significant that Harris pretended to act under the power of attorney from Lawson executed nearly two years later rather than under a power of attorney from plaintiff Puzey. Moreover, the tax authorities were never notified of the change of ownership, and continued mailing out tax notices as theretofore.

## Cause No. 5719–A, Hagerup v. Westfall.

The tract purchased by plaintiff Hagerup from Reck and his grantees is rectangular in form and is a part of the tidelands mortgaged by Harris to Reck in 1934. Approximately one-half of the Hagerup tract is covered by an apartment building on the southeast side, the remainder being reclaimed tideland which serves as a yard for the apartments. The only access to the yard, at least for vehicles, is by way of the northeast end of the yard from F Street.

The undisputed evidence is that, before the mortgage was given by Harris to Reck, the northeast end of this tract had been filled with rock, that the southwest end was covered with a pile structure, that the southeast side was occupied by an apartment building, and the northwest side was bounded by a pile structure upon which there was a boardwalk, leaving a small area in the middle unoccupied by any structure which is the area involved in this case, Hagerup asserting title under Reck, and Westfall by virtue of use and occupancy initiated in 1936. Westfall is the record owner of the adjoining property to the northwest of the disputed area, extending to 11th Street, by virtue of a conveyance from Harris in October 1937. Plaintiff Hagerup asserts that at the time this conveyance was made Harris had reason to suspect that, upon the foreclosure sale, a judgment would be obtained by Reck for the deficiency and that this conveyance was made solely for the purpose of placing the property beyond the reach of process and, therefore, that it was fraudulent and void. Ordinarily. evidence of this kind would be irrelevant but where, as here, it is contended that there was a conspiracy between Harris and Westfall to acquire an interest in the mortgaged premises adverse to the mortgagee, the evidence becomes relevant if it tends to shed light on the course of conduct and the system allegedly employed to defraud the mortgagee of his security.

The evidence shows that after this conveyance was made Harris continued to manage, improve, build upon, repair, rent and control the property, collect the income therefrom and report it to the Internal Revenue Bureau as his own. He made no accounting to Westfall except to say that the income fell short of the outgo. In determining outgo no charge was made by Harris for his services. In 1947 Harris constructed a concrete foundation for another building on this property, into which he put $150 of his own funds. In this connection plaintiff Hagerup points to testimony given by Harris which he contends affects his credibility to such an extent as to warrant, in connection with other like testimony, disregarding his entire testimony. While testifying concerning the construction of this concrete foundation on the land conveyed to Westfall in 1937, Harris said that before piling the lumber upon the area in dispute, preparatory to the erection of the building referred to, he first obtained Westfall's permission. When he was cross-examined as to why he had to obtain Westfall's permission to place this lumber on the area which Harris asserts belongs to Westfall, he was unable to give any explanation, Such testimony can be reconciled only on the theory that the conveyance to Westfall in 1937 was merely colorable or that Harris was so anxious to favor Westfall's claim to the disputed area in this case that the inconsistency of this statement was not perceived until after it was made. At any rate, in view of Harris' inability to explain the necessity for obtaining permission, an inference unfavorable to the defendant Westfall is justified.

Harris and Westfall assert that Harris' management, improvement and control of the property conveyed to Westfall in 1937 were authorized under an oral agreement between them that Harris should improve the property for their mutual benefit. Harris' acts and conduct with reference to this property are strikingly similar to his acts and conduct with reference to the property claimed by plaintiff Puzey in cause No. 5715–A. Thus, when he anticipated trouble over the Hagerup tract, he prepared and mailed a

power of attorney to Westfall who was then at Bethel, Alaska, about a thousand miles distant, and urged him to execute and return it to him. However, when Harris went to the States in 1946 and left Ove Graveson in charge of the same property, he did not obtain a similar power of attorney for Graveson, and this he was also unable to explain. In 1945 Harris erected a fence across the F Street entrance to the Hagerup tract and padlocked the gate. Indeed, several witnesses testified that, whatever acts of proprietorship were done on or about the area in dispute, they were done not by Westfall but by Harris.

## Conclusion.

Harris' relation with Lawson and Westfall would appear to be more than those of a mere agent. Not only did he exercise acts of proprietorship over the properties in dispute in these two cases, but he paid the taxes, took the initiative in obtaining powers of attorney, in instituting suits and was willing to incur the risk of personal combat in asserting the rights of his alleged principal, and even went so far as to prepare and procure the execution of the deed from Lawson to his daughter Leota Puzey. This is in sharp contrast with his conduct when Lawson and Westfall "jumped" his property. Then, as owner, he not only did not defend his property, but cooperated with the trespassers, while later, as agent, he was belligerent and resisted purchasers acting in good faith and under color of title. Lawson in a former case testified that he lived with Harris much of the time covered by the controversy, and that they "ate out of the same frying pan," and Westfall occupied Harris' home rent free from 1936 to 1944. Harris was unable to give a credible explanation of this circumstance. Indeed, their relations were such that it is not surprising to learn that the City of Juneau, apparently acting on common repute, deeded Lot 1 Block 233 to Harris instead of Westfall. When Harris was questioned why he had not reconveyed the lot to Westfall he answered that they would adjust their differences later or that it "would all come

out in the wash." It is obvious that this occurrence further supports the theory of Hagerup that Harris is the claimant and Westfall merely the front. Incidentally, the powers of attorney obtained from Lawson and Westfall in February 1945 and from Leota Puzey in 1946 were never recorded. Moreover, Harris' demeanor on the stand was not such as is expected of a person who is under a duty to explain suspicious circumstances. Thus, when he was questioned why he continued to pay the taxes on the boatshed from 1936 to 1939 after Lawson had "jumped" the property, he was rather evasive, and finally, upon admitting that he paid the taxes, he qualified his answer by saying that Popejoy, the City Clerk, could not testify from whom he, Harris, obtained the money to pay the taxes. This is not a frank and full disclosure of the facts such as was called for in the circumstances.

The use and occupancy of the areas involved in these disputes were initiated after the mortgage was given and before the mortgaged property was sold, and were for the benefit of Harris. Manifestly, no rights could be initiated thereby by Harris or his agents as against the mortgagee or his purchasers.

Findings of fact and judgment and decree may be prepared accordingly.